

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-1999

# Hull v. Kyler

Precedential or Non-Precedential:

Docket 97-7551

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Hull v. Kyler" (1999). *1999 Decisions.* Paper 233.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/233

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 23, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-7551

LARRY GENE HULL, Appellant

v.

KENNETH KYLER, Superintendent;
PA ATTORNEY GENERAL

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 97-cv-00353)
District Judge: Honorable Malcolm Muir

Argued: July 13, 1999

Before: BECKER, Chief Judge, ROTH, and RENDELL,
Circuit Judges.

(Filed: August 23, 1999)

       JAMES V. WADE, ESQUIRE
        (ARGUED)
       Federal Public Defender
       Middle District of Pennsylvania
       100 Chestnut Street, Suite 306
       Harrisburg, PA 17101

       Counsel for Appellant

JOHN F. NELSON, ESQUIRE
   (ARGUED)
Office of District Attorney
Franklin County Court House
157 Lincoln Way East
Chambersburg, PA 17201

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

This habeas corpus case is before us for the third time. Twenty years ago, petitioner Larry Gene Hull was convicted of first-degree murder in a Pennsylvania state court and sentenced to life imprisonment. For the past thirteen years, Hull has sought to have that conviction overturned on the ground that he received ineffective assistance of counsel at a pretrial competency hearing. Although the state courts have rejected his ineffectiveness claim, we have held that his counsel's performance was constitutionally deficient. See Hull v. Freeman, 932 F.2d 159, 168-69 (3d Cir. 1991) ["Hull I"]. However, we have also held that Hull procedurally defaulted this claim. See Hull v. Freeman, 991 F.2d 86, 90 (3d Cir. 1993) ["Hull II"]. The primary issues in the present appeal are whether the Pennsylvania courts have waived Hull's procedural default, and whether, if they have, he has demonstrated that his counsel's deficient performance was prejudicial under Strickland v. Washington, 466 U.S. 668 (1984).

For the reasons that follow, we conclude that the Pennsylvania courts have waived Hull's procedural default and that he thus may bring his claim in federal court. We also conclude that Hull was prejudiced by his counsel's failure to present any of the numerous pieces of available evidence regarding his competency or to challenge the government's single witness at his short competency hearing. We will therefore reverse the judgment of the District Court and remand the case with directions to issue a writ of habeas corpus conditioned on Hull's being retried

2

by the Commonwealth. Of course, before new criminal proceedings may be commenced against Hull, the Pennsylvania courts must determine that he has regained his competency to be tried.

I. Procedural History

The procedural history of this case is long and convoluted. We recite it in detail, given its importance to the first issue before us--procedural default.

A. The Initial State Proceedings

On February 26, 1975, Hull was charged with murder in Franklin County, Pennsylvania. On March 7, 1975, he was found incompetent to stand trial by the Franklin County Court of Common Pleas. At that time, a defendant who asserted his incompetence to stand trial in Pennsylvania was required to demonstrate by a preponderance of the evidence that he was incompetent. See Commonwealth v. Kennedy, 305 A.2d 890, 892 (Pa. 1973). Hull was committed to Farview State Hospital until a second competency hearing was held on July 31, 1979. By that time, the state legislature had altered the burden for a defendant asserting his incompetency to proof by"clear and convincing evidence." See Pa. Stat. Ann. tit. 50, S 7403(a) (West Supp. 1996), amended by Act of July 2, 1996, No. 77, S 2, 1996 Pa. Laws 481, 482 (requiring proof by a preponderance). However, as Hull had already been found incompetent in 1975, the burden to prove that he had regained his competency was most likely on the Commonwealth. See id. S 7403(e) (West Supp. 1999) (providing that, after an initial finding of incompetency, criminal proceedings will resume only "[w]hen the court . . . determines that such person has regained his competence to proceed").

At the July 31, 1979, competency hearing, the government presented a single witness, Dr. Harry C. Stamey, a court-appointed psychiatrist who had examined Hull. Dr. Stamey was asked only eleven questions. The first nine were preliminary questions regarding Dr. Stamey's background, qualifications, and the foundation for his

3

opinion. He was then asked what his opinion was "as to whether Mr. Hull would be able to understand the nature or object of the proceedings against him." App. at 422. He answered, "I feel that he could." Id. at 423. The final question posed to Dr. Stamey asked his opinion "as to whether or not Mr. Hull would be able to participate and assist in his defense." Id. He answered, "At that time I felt that he could do so." Id. Presumably, "that time" referred to the date of his examination of Hull, April 20, 1979, more than three months before the competency hearing. Then, when the court asked Hull's counsel to cross-examine Dr. Stamey, he responded, "We have no questions, Your Honor." Id.

The record does not disclose if the state court considered the report that Dr. Stamey had produced, although the doctor sent it to the court about three months before the hearing. See id. at 441. As we discuss in more detail infra Part IV.D.1, eight different doctors at Farview had found Hull mentally ill and incompetent on numerous occasions leading up to the competency hearing. Hull's counsel did not present any evidence from these examinations nor did he call any of these doctors as witnesses on Hull's behalf. Nor did his counsel argue to the trial court that Hull was incompetent, despite the prior finding of incompetence in 1975 and the strong evidence in this regard.

At the conclusion of the short competency hearing, and with the consent of Hull's counsel, the court found Hull competent to stand trial. On August 3, 1979, Hull entered a general guilty plea to murder. Following a degree-of-guilt hearing, the trial court found Hull guilty of first-degree murder and imposed a life sentence. Hull appealed his conviction, claiming that he could not be guilty of first-degree murder because "he was intoxicated and acting under the influence of a mental illness at the time of the shooting." Commonwealth v. Hull, 435 A.2d 1204, 1204 (Pa. 1981). In a one-paragraph per curiam opinion, the Pennsylvania Supreme Court rejected his appeal.

B. The Initial State Post-Conviction Proceedings

Hull filed a premature state post-conviction petition in January 1981. Following the denial of his motion for

4

modification of his sentence, he filed a new state post-conviction petition, on July 18, 1986. This petition was consolidated with his prior, premature petition. Hull raised four issues in his state petition, including the one he presses in the current habeas petition—that his trial counsel was ineffective for failing adequately to contest the issue of his competency to stand trial in 1979. On February 22, 1988, following two days of hearings in July and November of 1987, the Court of Common Pleas rejected all of the claims in Hull's post-conviction petition. See Commonwealth v. Hull, Crim. No. 101-1975 (Pa. C.P. Ct. Feb. 22, 1988). Hull's appeal to Pennsylvania Superior Court from the denial of post-conviction relief raised only a single issue, the current ineffectiveness claim. On September 30, 1988, the Superior Court affirmed the denial of relief on this claim. See Commonwealth v. Hull, No. 215 Harr. 1988 (Pa. Super. Ct. Sept. 30, 1988).

The Superior Court was the last state court to reach the merits of Hull's ineffective-assistance claim. In rejecting this claim, the court "reviewed the colloquy which followed the guilty plea and [was] impressed with appellant's ability to recount in detail his actions and emotions at the time of the murder." Id., slip op. at 3-4. The court held that this "ability" demonstrated that Hull was able to assist his counsel and to understand the proceedings against him, making his ineffectiveness claim meritless. See id. at 4. The court added that Hull's trial counsel testified that he failed to cross-examine the government's witness or to offer independent evidence of Hull's incompetence because of "the findings of the court-appointed psychiatrist, his own observation of appellant, and appellant's expressed wish to be found competent and enter a guilty plea"—and the court held that this constituted a reasonable basis for counsel's actions. Id. The court did not directly address the single substantive issue before us, i.e., whether Hull was prejudiced by his counsel's deficient performance.

Following issuance of the Superior Court order, Hull's counsel failed to timely file a petition for allowance of appeal with the Pennsylvania Supreme Court.1 When he

_____

1. The petition for allowance of appeal is sometimes referred to as a petition for allocatur. We use the terms interchangeably.

5

learned of his counsel's actions (or lack thereof), Hull filed a pro se petition for allowance of appeal nunc pro tunc. The Pennsylvania Supreme Court denied Hull's petition, without comment, on February 21, 1989. See Commonwealth v. Hull, No. 4 M.D. Misc. Dkt. 1989 (Pa. Feb. 21, 1989).

C. The Initial Federal Habeas Petition

On May 8, 1989, Hull filed a pro se petition for a writ of habeas corpus in the District Court for the Middle District of Pennsylvania, pursuant to 28 U.S.C. S 2254. He raised a number of issues, including the ineffective-assistance claim. Following appointment of counsel and a magistrate judge's initial report and recommendations on the other (non-competency related) issues, the district court remanded for consideration of the ineffectiveness/ competency claim. The magistrate judge found that Hull had exhausted his state remedies, but that the claim did not have merit. Hull filed objections to the magistrate judge's report, and on July 13, 1990, the district court (following de novo review) held that Hull had received ineffective assistance of counsel at the 1979 competency hearing. The district court issued an order on September 11, 1990, granting Hull the writ of habeas corpus, and remanding the case to the state trial court for a hearing to determine Hull's competency to stand trial as of 1979. The Commonwealth timely appealed this ruling.

In Hull I, we reviewed essentially the same two issues before us now: whether Hull's ineffectiveness claim was procedurally defaulted, and (if it was not) whether he had received ineffective assistance of counsel at the 1979 competency hearing. First, we held that Hull's failure to file a timely petition for allowance of appeal from the Superior Court's 1988 decision did not constitute a procedural default: "Absent a clear and express statement that the Pennsylvania Supreme Court based its denial [of Hull's petition for allowance of appeal] on a procedural default (to wit, untimeliness), we must assume that the Court denied Hull's appeal on the merits." Hull I, 932 F.2d at 167 (emphasis omitted).

Regarding Hull's substantive claim, we agreed with the district court that the first prong of the Strickland

6

ineffectiveness test had been met, as his " `counsel's representation fell below an objective standard of reasonableness.' " Id. at 169 (quoting Strickland, 466 U.S. at 688). However, we were unable to discern whether the district court had reached the second Strickland prong, i.e., that Hull was prejudiced by his counsel's deficient performance. We therefore remanded the case to the district court for a determination whether Hull had been prejudiced by his counsel's failure to cross-examine the government's witness or to present a case at the 1979 competency hearing. See id. at 170. We also made clear that, if the district court found that Hull was prejudiced, the proper remedy would not be a state hearing to determine Hull's competency as of 1979. Rather, the appropriate remedy would be the granting of a writ of habeas corpus conditioned on the state retrying Hull after it established that he had regained his competency to be tried.

On remand, the district court held two days of hearings, in September and October of 1991, on the issue of prejudice. On October 18, 1991, the district court issued an opinion and order in which it held that the outcome of Hull's 1979 competency hearing would not have been different if his counsel's performance had not been deficient. See Hull v. Freeman, Civ. No. 89-0681 (M.D. Pa. Oct. 18, 1991). It therefore denied his petition for a writ of habeas corpus. Hull timely appealed to this court.

In Hull II, we declined to reach the merits of Hull's ineffectiveness claim because we concluded, contrary to our holding in Hull I, that the claim had been procedurally defaulted. We reasoned that two U.S. Supreme Court decisions handed down less than two months after Hull I compelled the finding that "the Pennsylvania Supreme Court's denial without comment of Hull's untimely appeal of his state petition was based on procedural default." Hull II, 991 F.2d at 90 (citing Coleman v. Thompson, 501 U.S. 722 (1991), and Ylst v. Nunnemaker, 501 U.S. 797 (1991)). After holding that Hull's claim was procedurally defaulted, we noted that he could still bring his claim in federal court if he established cause and prejudice for his procedural default. The "cause" that Hull put forth was his post-conviction counsel's ineffectiveness in failing tofile a timely

7

appeal to the state supreme court, as well as his own illiteracy and mental retardation. We rejected these as insufficient for establishing "cause" under controlling Supreme Court precedent. See id. at 91. However, we held that "Hull's mental deficiencies, combined with post-conviction counsel's failure to file the appeal and failure to notify Hull until after the deadline passed, create a colorable claim for waiver [of the procedural default] under Pennsylvania law." Id. We therefore remanded the case to the district court with directions to dismiss Hull's habeas petition without prejudice, so that he could "attempt to establish a basis for waiver in state court, after which he may obtain federal habeas review if the Pennsylvania Supreme Court rejects his claim on the merits." Id. at 92.

Because it is important to our analysis of the waiver issue, see infra Part III.B, we rescribe our reasoning in Hull II regarding Hull's attempt to establish waiver in state court:

> Accordingly, we will dismiss Hull's petition without prejudice so he may file a state post-conviction petition to assert his claim of ineffective assistance of post-conviction counsel as a ground for his untimely petition for allocatur on his ineffective assistance of trial counsel claim. If the Pennsylvania Supreme Court rejects Hull's ineffective assistance of post-conviction counsel claim, we presume it will deny his petition for permission to appeal nunc pro tunc on this basis. It will then have ruled based on procedural default and, under Coleman, Hull will be barred from federal habeas review . . . .

> By contrast, if the Pennsylvania Supreme Court upholds Hull's ineffective assistance of post-conviction counsel claim, we presume it will grant his petition for permission to appeal nunc pro tunc on his ineffective assistance of trial counsel claim. The court will then either deny or grant Hull's petition for allocatur on his ineffective assistance of trial counsel claim. In either scenario, the court will be considered to have reached the merits of Hull's ineffective assistance of trial counsel claim, and thus to have waived his procedural default with respect to this claim. If the Pennsylvania Supreme

8

Court grants Hull's petition for allocatur, it will in fact reach the merits of the ineffective assistance of trial counsel claim. If the court denies Hull's petition for allocatur, it will be deemed, under the Ylst "look-through" rule, to have decided the ineffective assistance of trial counsel claim on the same ground as the Pennsylvania Superior Court, which rejected it on the merits. Thus, in either event, Hull will have obtained a determination on the merits of his ineffective assistance of trial counsel claim by the Pennsylvania Supreme Court, and, necessarily, a ruling by that court that it waived Hull's procedural default of this claim on the ground he received ineffective assistance of post-conviction counsel.

If the Pennsylvania Supreme Court denies Hull's ineffective assistance of trial counsel claim either by denying allocatur or by granting allocatur and rejecting it on the merits, he may re-file his federal habeas petition.

Id. at 93-94 (footnote omitted) (emphasis added). On May 21, 1993, following our directive, the district court dismissed Hull's habeas petition without prejudice. See Hull v. Freeman, Civ. No. 89-0681 (M.D. Pa. May 21, 1993).

D. The Second State Post-Conviction Proceedings

On March 16, 1995, Hull returned to the Franklin County Court of Common Pleas, and sought leave to file a petition for allowance of appeal nunc pro tunc to the Pennsylvania Supreme Court. Finding the issue of his first post-conviction counsel's ineffectiveness "rather straightforward," the court granted Hull the relief he sought, on August 30, 1995. See Commonwealth v. Hull, Crim. No. 101-1975 (Pa. C.P. Ct. Aug. 30, 1995). The specific relief granted to Hull was as follows:

[D]efendant is granted leave to file a petition for appeal nunc pro tunc to the Supreme Court of Pennsylvania from the decision of the Superior Court of Pennsylvania dated September 30, 1988, conditioned upon the relief granted herein not being inconsistent with the order of the Supreme Court dated February 21, 1989.

9

Id., slip op. at 7.

On September 28, 1995, the Commonwealth filed a notice of appeal to the Pennsylvania Superior Court from the Common Pleas Court's order. The following day, the Common Pleas Court filed an order directing the Commonwealth to serve the court with a statement of the matters complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). On October 23, 1995, fifty-four days after the Common Pleas Court had issued its original order granting Hull the relief he sought, the government filed the statement requested by the court. On the next day, the Common Pleas Court filed a supplemental opinion and order, denying Hull his requested relief, which it had granted him fifty-five days before. See Commonwealth v. Hull, Crim. No. 101-1975 (Pa. C.P. Ct. Oct. 24, 1995).

Hull filed a notice of appeal from the Common Pleas Court's second order. This appeal and the Commonwealth's appeal of the initial Common Pleas Court order were consolidated. The parties stipulated that the Commonwealth would be designated the appellant for purposes of the appeal. The Commonwealth failed tofile its brief before the Superior Court, and on January 23, 1996, the Superior Court dismissed the consolidated appeal. See Commonwealth v. Hull, Nos. 735 & 848 Harr. 1995 (Pa. Super. Ct. Jan. 23, 1996). As far as the present record reveals, the Commonwealth did not seek reconsideration of this dismissal order nor seek review of the dismissal by the Pennsylvania Supreme Court.

Meanwhile, on September 20, 1995, on the basis of the initial Common Pleas Court order, Hull filed a petition for allowance of appeal nunc pro tunc to the state supreme court, in which he raised the ineffective-assistance claim that is before us now. On February 29, 1996, the Pennsylvania Supreme Court denied without comment Hull's petition for allowance of appeal from the Superior Court's 1988 decision. See Commonwealth v. Hull, 673 A.2d 332 (Pa. 1996).

E. The Second Federal Habeas Petition

Hull filed his present petition for a writ of habeas corpus on March 6, 1997. After referral, the Magistrate Judge

10

found that Hull's ineffective-assistance claim remained procedurally defaulted and that, for the reasons stated in the district court's 1991 opinion, Hull had not demonstrated that he was prejudiced by his counsel's deficient performance at the 1979 competency hearing. On October 2, 1997, following Hull's filing of objections (and the Commonwealth's failure to file a response), the District Court rejected the Magistrate Judge's recommendation regarding procedural default, but denied Hull's petition on the merits, "for the reasons set forth in [its] opinion and order dated October 18, 1991." Hull v. Kyler, No. 4:CV-97-353, slip op. at 7 (M.D. Pa. Oct. 2, 1997). Hull filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. SS 1291 & 2253.

II. Standard of Review

Our review of the procedural default issue is plenary. See Toulson v. Beyer, 987 F.2d 984, 986 (3d Cir. 1993). We review the District Court's findings of fact regarding Hull's substantive claim for clear error. See Government of V.I. v. Weatherwax, 77 F.3d 1425, 1430 (3d Cir. 1996). In the 1997 order from which Hull appeals, the District Court incorporated the findings of fact from its 1991 order denying Hull's initial petition. See Hull v. Kyler, No. 4:CV-97-353, slip op. at 7. None of the facts relevant to the prejudice issue appear disputed. See Hull v. Freeman, Civ. No. 89-0681, slip op. at 3-9 (M.D. Pa. Oct. 18, 1991). We exercise plenary review over the question whether the facts found by the District Court demonstrate prejudice under Strickland. See Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998).

III. Procedural Default

A. Background

It is well established that a state prisoner may not seek habeas relief in federal court if he has failed to raise the alleged error in state court. If state proceedings remain available, the claim is not yet exhausted, and the habeas petition must be dismissed. See 28 U.S.C. S 2254(b)(1), (c)

11

(1994 & Supp. II 1996); Rose v. Lundy, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error."). If state avenues of relief, including post-conviction proceedings, have been exhausted, but the petitioner has failed to raise the alleged grounds for error, the claim is procedurally defaulted and may not be raised in federal court. See Coleman, 501 U.S. at 729–30; Wainwright v. Sykes, 433 U.S. 72, 81–87 (1977).

Recently, the Supreme Court made clear that a petitioner procedurally defaults a claim if he fails to raise it in a discretionary state appeal. See O'Sullivan v. Boerckel, 119 S. Ct. 1728, 1734 (1999). In Boerckel, the Court acknowledged that the Illinois Supreme Court was not obligated to hear an appeal in a criminal case, but relied on the fact that it might take such an appeal to hold that failure to petition for such review constituted procedural default. Therefore, Hull's failure to timely petition the state supreme court for allowance of appeal on his ineffectiveness claim constitutes procedural default.

A petitioner with a defaulted claim may nonetheless raise this claim in federal habeas proceedings if either (1) he can demonstrate a valid cause for the default and prejudice from the alleged violation of his constitutional rights, see Coleman, 501 U.S. at 750; Sykes, 433 U.S. at 87, or (2) the state has waived (or declined to rely on) the procedural default, see Ylst, 501 U.S. at 801; Harris v. Reed, 489 U.S. 255, 262–63 (1989). We have already held that Hull cannot meet the first prong of the cause-and-prejudice exception. See Hull II, 991 F.2d at 93. Therefore, Hull can only bring his current claim in federal court if the Pennsylvania courts have waived the procedural default of failing to timely file an appeal to the state supreme court from the Superior Court's denial of his post-conviction claim. As we outlined in detail supra Part I.C, our decision in Hull II gave Hull the opportunity to return to state court to seek such a waiver. The first question we must answer in this case is whether

12

he obtained this relief in his second trip to state post-conviction court.[2]

B. Waiver of Hull's Procedural Default

1.

We briefly review the relevant events from Hull's two state post-conviction proceedings, as these events furnish the answer to the initial question. First, on September 30, 1988, the Pennsylvania Superior Court rejected Hull's ineffective-assistance claim on the merits. Hull's counsel then failed to timely file a petition for allowance of appeal to the state supreme court. Almost seven years later, Hull sought, and received, from the Franklin County Court of Common Pleas leave to file a petition for allowance of appeal nunc pro tunc to the state supreme court from the Superior Court's 1988 decision. The leave was granted on the basis of his post-conviction counsel's ineffectiveness in failing to timely file such a petition originally or to notify Hull of this failure in a timely fashion. See Commonwealth v. Hull, Crim. No. 101-1975, slip op. at 5-6 (Pa. C.P. Ct. Aug. 30, 1995). This leave to file a nunc pro tunc appeal, granted by the state court, constituted a waiver of the

_____

2. Before denying Hull's claim on the merits, the District Court rejected the Magistrate Judge's finding that there had been no state waiver of Hull's procedural default. The Commonwealth did not appeal this decision of the District Court, nor do we believe it could have. See Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 333 (1980) ("Ordinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom. A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it."). However, "[i]t is well accepted . . . that without filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below." Blum v. Bacon, 457 U.S. 132, 137 n.5 (1982). The Commonwealth has raised the procedural-default issue in its brief, and we therefore find it appropriate to reach this issue. Cf. Smith v. Horn, 120 F.3d 400, 408 (3d Cir. 1997) (noting that the court of appeals may raise procedural default sua sponte), cert. denied, 118 S. Ct. 1037 (1998).

procedural default that arose when Hull failed originally to timely appeal from the Superior Court's 1988 decision.

If the Commonwealth wished to avoid the state court's waiver of the procedural default, it was incumbent upon it to appeal this order of the Common Pleas Court. Initially, it did so. However, after the Commonwealth failed to file a brief, the Superior Court dismissed its appeal. As a result, the Common Pleas Court's (initial) order granting Hull the relief he sought, i.e., a waiver of his procedural default so that he could file a petition for allowance of appeal to the Pennsylvania Supreme Court, remained in effect. Following the trial court's granting of this relief, Hull timely filed his petition for allowance of appeal nunc pro tunc, seeking review of the Superior Court's 1988 decision. The state supreme court denied the appeal without comment.

2.

While the Common Pleas Court qualified its order granting Hull leave to file his nunc pro tunc petition by providing that it was doing so only on the condition that the state supreme court not consider such a petition untimely, the state supreme court, in silently denying Hull's petition, gave no indication that it was invoking this "qualifier." It could have done so by either dismissing (rather than denying) Hull's second petition, or by clearly stating that Hull's petition remained untimely and that his procedural default remained effective. It did neither, but instead followed the trial court's granting of relief to Hull with a denial of his second nunc pro tunc petition, without comment. Therefore, we read the state supreme court's unexplained denial of Hull's most recent nunc pro tunc petition as "a determination on the merits of his ineffective assistance of trial counsel claim by the Pennsylvania Supreme Court, and, necessarily, a ruling by that court that it waived Hull's procedural default of this claim on the ground he received ineffective assistance of post-conviction counsel." Hull II, 991 F.2d at 94.

In Hull II, we did not anticipate that Hull would obtain the waiver he sought from a lower state court and then be unable to have this relief ratified (or overturned) by the

14

state supreme court. We assumed that one of three things would happen after Hull returned to state court. First, the state supreme court could reject Hull's waiver argument, and he would be procedurally barred from bringing his federal habeas claim. Second, the state supreme court could accept his waiver argument, then grant his petition for allowance of appeal nunc pro tunc from the 1988 Superior Court decision, and rule on (and reject) the merits of his ineffective-assistance claim, in which case he would be able to raise his ineffective-assistance claim in federal habeas court. Third, the state supreme court could accept his waiver argument, but deny his petition for allowance of appeal nunc pro tunc from the Superior Court's decision, in which case he also would be able to raise his ineffective-assistance claim in federal habeas court. See Hull II, 991 F.2d at 93-94 & n.6. Because the Commonwealth failed to pursue its appeal from the state post-conviction court's granting of a waiver of Hull's procedural default, the state supreme court never had the formal opportunity, through no fault of Hull's, to fulfill one of these three scenarios by expressly accepting or rejecting Hull's waiver argument.

The actual course of events in state court was essentially that outlined in Hull II's final scenario, i.e., acceptance of Hull's waiver argument, and then denial of his petition for allowance of appeal nunc pro tunc. However, it was the state trial court, and not the state supreme court, that accepted Hull's waiver argument, after which the state supreme court denied the petition for allowance of appeal from the Superior Court's 1988 decision. Although we did not foresee, in Hull II, a scenario in which Hull's waiver claim would never get past the state trial court, Hull only needed a waiver from "the Pennsylvania courts," not necessarily from the state's highest court. See id. at 93 ("Hull can only obtain federal habeas review if the Pennsylvania courts waive his procedural default." (emphasis added)); cf. Ylst, 501 U.S. at 801 ("State procedural bars are not immortal, however; they may expire because of later actions by state courts." (emphasis added)). Once a lower state court granted Hull a waiver, and the Commonwealth failed to appeal from this order (and the state supreme court did not indicate that the waiver was improperly granted when it denied Hull's petition for

15

allowance of appeal), Hull had done what federal law and our decision in Hull II required of him. To hold otherwise would allow states to circumvent the waiver exception to the procedural-default rule by failing to appeal from lower state court decisions holding that a procedural default is waived.

In short, our holding in Hull II compels the result in the present case: We expressly held in Hull II that the state courts would be deemed to have waived Hull's procedural default if he was given permission to file a petition for allowance of appeal nunc pro tunc (which he was) and the state supreme court then denied that petition (which it did). In fact, we held that, "as a matter of federal law," if the state supreme court denied Hull's petition for allowance of appeal under these circumstances, it would be deemed a decision on the merits. See Hull II, 991 F.2d at 94 n.5; see also Coleman, 501 U.S. at 739 ("It remains the duty of the federal courts . . . to determine the scope of the relevant state court judgment."). We are of course bound by Hull II but, at all events, agree that on these facts when the Pennsylvania courts granted Hull the right to file a petition for allowance of appeal nunc pro tunc, the subsequent denial of that petition was on the merits.

3.

Despite the foregoing, the Commonwealth argues that the state courts have not waived Hull's procedural default because the second post-conviction court issued a supplemental opinion and order rejecting Hull's waiver argument, fifty-five days after issuing its initial opinion and order granting him relief. We agree that, if this is a valid order regarding Hull's request for waiver of the procedural default, and if he failed to adequately appeal from this order, his federal habeas claim remains procedurally barred. We reject the Commonwealth's argument, however, because once an appeal was filed, state law clearly precluded the post-conviction court from issuing a "supplemental" order that completely reversed the effects of its initial, valid order.

It is settled law in Pennsylvania that the timely filing of a notice of appeal divests the trial court of jurisdiction to

16

take any further action in a case. See Pa. R. App. P. 1701(a). A court may grant reconsideration of its order if an application for reconsideration is filed and granted within the time provided for filing a notice of appeal (thirty days). See Pa. R. App. P. 1701(b)(3). In this case, however, there is no indication that the Commonwealth filed (or that the trial court granted) such an application for reconsideration within thirty days. Therefore, the court had no authority to "reconsider" the merits of its initial order.

In issuing its "supplemental" order, the state court in this case purported to rely on Pennsylvania Appellate Rule 1925, which allows a lower court to "enter an order directing the appellant to file of record in the lower court and serve on the trial judge a concise statement of the matters complained of on the appeal." Pa. R. App. P. 1925(b). The purpose of the rule, as seen most clearly by subsection (a), is to allow the lower court to clarify the basis of its initial order to ensure meaningful appellate review. See Pa. R. App. P. 1925(a) ("Upon receipt of the notice of appeal the judge who entered the order appealed from, if the reasons for the order do not already appear of record, shall forthwith file of record at least a brief statement, in the form of an opinion, of the reasons for the order, or for the rulings or other matters complained of, or shall specify in writing the place in the record where such reasons may be found."); see also Commonwealth v. Stilley, 689 A.2d 242, 247 (Pa. Super. Ct. 1997); Franklin S. Van Antwerpen et al., Plugging Leaks in the Dike: A Proposal for the Use of Supplemental Opinions in Federal Appeals, 20 Cardozo L. Rev. 1233, 1235–36 (1999).

Nothing in Rule 1925, which involves only "clarification" of lower court orders for the purpose of appeal, gives a trial court authority to issue a supplemental opinion in which it completely reverses its prior holding, more than thirty days after entry of the original order and without an order granting reconsideration of the original order. See Pennsylvania Indus. Energy Coalition v. Pennsylvania Pub. Util. Comm'n, 653 A.2d 1336, 1346 (Pa. Commw. Ct. 1995) (holding that a lower tribunal that "made substantive changes to its earlier decision" had effectively granted reconsideration, not clarification, of that prior decision, and

17

it did not have authority to do so more than thirty days after the prior decision was filed), aff'd per curiam, 670 A.2d 1152 (Pa. 1996); Commonwealth v. McMillan, 545 A.2d 301, 305 (Pa. Super. Ct. 1988) ("[I]t is well-settled that the trial court loses all power to alter its orders, final or interlocutory, thirty days from entry of judgment of sentence unless an order granting reconsideration is granted within that thirty day period."), aff'd per curiam, 567 A.2d 1043 (Pa. 1990).

Under Pennsylvania's rules of appellate procedure and its unequivocal caselaw, the trial court's "supplemental" decision had no effect on this case. Indeed, "it was a nullity." Commonwealth v. Hairston, 470 A.2d 1004, 1006 (Pa. Super. Ct. 1984). Once the post-conviction court granted Hull the relief he sought and thirty days passed without the granting of a motion for reconsideration, the trial court's order was final, and was alterable only by a state appeals court. Cf. 42 Pa. Cons. Stat. Ann. S 5505 (West 1981) (permitting modification of a court order "within 30 days after its entry . . . if no appeal from such order has been taken").3 The Commonwealth abandoned its

_____

3. The Pennsylvania Supreme Court recently addressed the issue of "supplemental" orders indirectly. See Commonwealth v. Lantzy, ___ A.2d ___, No. 66 W.D. 1988, 1999 WL 455695 (Pa. July 7, 1999). In Lantzy, a defendant's counsel failed to inform him that a trial court's modification of his sentence was a nullity because it was entered more than thirty days after imposition of the original sentence and without an express grant of reconsideration. See id. at *1. Because the defendant withdrew the appeal from his original (and only valid) sentence, and the appeal from the modified (invalid) sentence was quashed, he lost any opportunity to directly appeal his sentence. See id. The court held that the advice (or lack thereof) that led to this scenario constituted ineffective assistance of counsel. See id. at *7 ("As counsel lacked a reasonable basis for failing to advise Lantzy that the sentence modification would be invalid, counsel's representation was deficient."). This implies that the state of the law in this area is quite well-settled.

The court additionally noted that it was questionable whether the defendant "would have been able to compel the Department of Corrections to honor the [modified] order had its validity been challenged," citing a case that held that "mandamus does not lie to compel the Department of Corrections to honor a facially invalid order."

18

only avenue of relief, however, when it failed tofile a brief
with the Superior Court. Therefore, the Pennsylvania courts
definitively waived Hull's procedural default when the order
granting such relief became final and not subject to further
appeal.4

_____

Id. at *7 n.9 (emphasis added) (citing Fajohn v. Commonwealth, 692 A.2d
1067, 1068 (Pa. 1997)). In our view, this recent case confirms that a
supplemental or modified order, entered more than thirty days after an
initial order and unaccompanied by an express grant of reconsideration,
is a "nullity," is "facially invalid," and should be given no effect.

4. The post-conviction court issued its supplemental order reversing its
prior order because it found that the initial order was based on an
incorrect interpretation of state law. However, it is not clear that state
law would have precluded Hull from raising the issue of his trial
counsel's ineffectiveness in a second post-conviction petition.
Pennsylvania courts will entertain a post-conviction claim that has been
waived or that is contained in a second (or later) post-conviction
petition
if the petitioner makes "a strong prima facie  showing . . . that a
miscarriage of justice may have occurred." Commonwealth v. Lawson,
549 A.2d 107, 112 (Pa. 1988). This condition is met when a petitioner is
actually innocent or when "the proceedings resulting in his conviction
were so unfair that a miscarriage of justice occurred which no civilized
society can tolerate." Commonwealth v. Szuchon, 633 A.2d 1098, 1100
(Pa. 1993); see also Lawson, 549 A.2d at 112 (Papadakos, J., concurring)
(defining miscarriage of justice as an error that is "so serious that it
undermined the reliability of the outcome of the proceeding," as when "a
conviction can be shown to result from a breakdown in the adversary
process").

The Pennsylvania courts, including the state supreme court, have
frequently considered the merits of petitioners' claims in second post-
conviction petitions, and have held that no miscarriage of justice
occurred because the underlying claims had no merit. For example, in
Commonwealth v. Jermyn, 709 A.2d 849 (Pa. 1998), the state supreme
court entertained a petitioner's claim, in a second post-conviction
petition, that "his prior counsel were ineffective for failing to raise"
the
issue of his competency to stand trial. Id. at 860. The court noted that
"Jermyn points to nothing which occurred during trial . . . to establish
that he was incompetent to stand trial and that the trial court should
have held a hearing on that issue." Id. at 862. It then observed that the
second post-conviction court had "concluded that there was no merit to
Jermyn's contentions" regarding his competency and had "ruled that
Jermyn failed to show that a miscarriage of justice occurred in this

19

4.

Finally, we choose to address the facial tension between our conclusion today that the Pennsylvania Supreme Court's silent denial of Hull's second petition for allowance of appeal constituted a decision on the merits and our determination in Hull II that the court's silent denial of Hull's first petition was based on procedural default. The primary basis for our decision in Hull II was the holding by

_____

regard." Id. It concluded: "We agree with the PCRA court." Id. Chief Justice Flaherty dissented, concluding that the failure of Jermyn's counsel to raise the incompetency issue was "a miscarriage of justice sufficient to warrant PCRA relief." Id. at 871 (Flaherty, C.J., dissenting).
The majority took issue with the Chief Justice's view of the merits, but not with his assertion that such ineffectiveness of trial counsel would constitute a miscarriage of justice. See id. at 862 n.34.

We view the discussion and holding in Jermyn (and in many similar state cases) as implicitly recognizing that a due process claim such as Hull's--i.e., that he was convicted of first-degree murder while incompetent to stand trial--is potentially one in which "a miscarriage of justice occurred which no civilized society can tolerate." As we discuss infra Part IV.E, we believe that Hull's underlying claim is meritorious and
that there is a reasonable probability that he was convicted while incompetent to stand trial. Therefore, under state law, the post-conviction court may have been correct in initially determining that Hull was entitled to the relief he sought, which would allow him to raise his claim before the Pennsylvania Supreme Court. Cf. Doctor v. Walters, 96 F.3d 675, 682 (3d Cir. 1996) (concluding that the Pennsylvania courts might find a "miscarriage of justice" occurred, justifying waiver of a procedural default, when a trial court "entered a verdict against [petitioner] without convening any proceedings in open court and without any semblance of resuming adversary proceedings").

More importantly, as we noted in Hull II,"the concept of federal-state comity underlying federal habeas review entitles Hull to a state court adjudication of his claim for waiver." Hull II, 991 F.2d at 91. Hull sought
and obtained such an "adjudication of his claim for waiver," and prevailed on that claim. The Commonwealth may not now allege error in the trial court's initial (and only valid) ruling, from which it failed to adequately appeal. When comity compels us to leave adjudication of an issue to a state court, see id. at 91-93, it likewise requires us to respect
that court's determination of the issue, despite the losing party's claim that the determination was contrary to state law.

20

the Supreme Court in Ylst that an unexplained order of a state court upholding a prior judgment of a lower court is presumed to be based upon the same ground as that relied upon by the lower court. See Ylst, 501 U.S. at 803. If the lower court rejected a claim on the merits, a silent denial of an appeal is presumed to be on the merits; if the lower court relied on a procedural default, an unexplained order affirming that judgment is presumed to similarly rely on procedural default. Although neither of these situations-- which were the central focus of Ylst--accurately described Hull's procedural posture, we looked, in Hull II , to the Supreme Court's additional observation that the presumption could be rebutted in certain situations, such as when a lower court reached the merits of a federal claim, but the appeal to the higher court "that issued the unexplained order was plainly out of time," Ylst, 501 U.S. at 804, as was the case here. On the basis of this observation in Ylst, we concluded that the state supreme court's denial of Hull's first untimely petition was based on procedural default. See Hull II, 991 F.2d at 90–91.

The Court in Ylst, however, made clear that "procedural bars are not immortal," as "later actions by state courts" may lift them. Ylst, 501 U.S. at 801. While rejecting the petitioner's argument in Ylst that his claim was not barred because the state courts might waive his procedural default, the Court acknowledged that "they could do so," id. at 806, but found no evidence that they had. In this case (unlike in Ylst), the petitioner did obtain such a waiver of his procedural default from the state courts.5 Therefore, as

_____

5. In Ylst, the Court explained that a procedural default would be lifted if a state court presented with a federal constitutional claim reached the merits of that claim after the procedural default had arisen in a lower court. See Ylst, 501 U.S. at 801. We acknowledge that the Common Pleas Court did not reach the merits of Hull's underlying claim in his second post-conviction petition, but only granted Hull leave to file a nunc pro tunc appeal to the state supreme court. Ylst, however, does not address the precise situation here, as no court expressly rejected Hull's claim on the basis of procedural default (as the state courts did in Ylst and Coleman). Rather, in Hull II, we interpreted the state supreme court's silent denial of Hull's untimely petition as being based on procedural default. Because the Common Pleas Court and the Superior

21

Hull II contemplated, Hull obtained a waiver of his procedural default, presented his substantive claim to the one state court yet to hear that claim (the state supreme court), and had the claim rejected.

Based on the foregoing, we hold that Pennsylvania has waived Hull's procedural default that occurred when he failed to file a timely petition for allowance of appeal to the state supreme court from the Superior Court's 1988 decision rejecting his ineffective-assistance claim. We therefore turn to the merits of this claim.

IV. Hull's Ineffective-Assistance Claim

A. Applicability of AEDPA

We must initially determine whether the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, applies to Hull's ineffective assistance claim. If it does, our review will be somewhat different than theretofore because 28 U.S.C. S 2254(d)(1), as amended by AEDPA, requires us to give heightened deference to state court adjudications of habeas claims. Hull argues that AEDPA does not apply to his claim because the Supreme Court has held that petitionsfiled before AEDPA's enactment on April 24, 1996, are governed by the pre-AEDPA version of S 2254, see Lindh v. Murphy, 521 U.S. 320, 336 (1997), and his initial petition was filed well before AEDPA's enactment. We disagree.

Hull's initial petition was dismissed without prejudice, and it is only his present petition that is relevant for
_____

Court had already addressed the merits of Hull's claim, they did not need to do so again to excuse his procedural default.

The Supreme Court has never squarely addressed how a petitioner may have a procedural default such as the present one excused by a state court. It has only addressed the issue of"waiver" of procedural default when one court has rejected a claim on the basis of procedural default, and a higher court later addressed the merits of the claim. This is not something Hull could have sought, as no state court explicitly rejected his claim on the basis of procedural default, but rather we did (in Hull II), based on our reading of Ylst and Coleman.

22

purposes of analyzing his ineffectiveness claim. His present petition was filed almost a year after AEDPA's enactment, and is therefore governed by the amended S 2254. See In re Minarik, 166 F.3d 591, 598 (3d Cir. 1999) (interpreting Lindh as holding that the post-AEDPA S 2254 applies to petitions filed after April 24, 1996); cf. Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 884-85 (3d Cir. 1999) (en banc) (applying post-AEDPA S 2254(d)(1) to a petition filed after AEDPA's enactment, although the petitioner had filed a prior, dismissed petition before 1996), petition for cert. filed, 68 U.S.L.W. 3008 (U.S. June 22, 1999) (No. 98-2050).

Given our holding in Minarik, it is only because Hull filed a petition before AEDPA's enactment that he can even plausibly argue that his claim is not governed by the AEDPA amendments. Yet his pre-AEDPA petition was dismissed without prejudice. Typically, when a complaint (or habeas petition) is dismissed without prejudice, that complaint or petition is treated as if it never existed. See, e.g., Christy v. Horn, 115 F.3d 201, 208 (3d Cir. 1997) (holding that a habeas petition filed after a prior one was dismissed without prejudice is considered the petitioner's first habeas petition); cf. Cardio-Medical Assocs. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 77 (3d Cir. 1983) ("It is a well recognized principle that a statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice. As regards the statute of limitations, the original complaint is treated as if it never existed."). Therefore, the fact that Hull filed a prior (since dismissed) petition is irrelevant to such issues as the law that applies to his present petition.

We recently held, dealing with a cognate issue, that a district court did not abuse its discretion in disallowing an amendment to a S 2255 motion, when the amendment was sought after the AEDPA limitations period had run. See United States v. Duffus, 174 F.3d 333, 337 (3d Cir. 1999). We reasoned that allowing the amendment would have "frustrated the intent of Congress that claims under 28 U.S.C. S 2255 be advanced within one year after a judgment of conviction becomes final." Id. If a petitioner cannot amend a timely petition after a limitations bar has risen, we

23

think it unlikely that a petitioner could reach back to a prior petition to avoid the effect of AEDPA's passage, which occurred after the prior petition had been completely dismissed and before the current petition had beenfiled.

While applying AEDPA's stricter standard to Hull's claim may appear unfair, given his attempt to bring his current claim to federal court well before AEDPA's enactment, he did not have a cognizable federal habeas claim until February 29, 1996, when his procedural default was waived and his state post-conviction remedies exhausted. His activity before that date, including the filing of a federal habeas petition in 1989, is simply irrelevant for purposes of determining which law applies to the present claim, because it was only after February 29, 1996, that Hull could petition a federal court for habeas relief on his exhausted and non-defaulted claim. Once AEDPA became effective approximately two months later, it governed all new habeas petitions filed after that date, including Hull's current petition, which was filed on March 6, 1997.

B. Standard of Review (Under AEDPA)

Section 2254(d)(1), as amended by AEDPA, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. S 2254(d)(1) (Supp. II 1996). Our recent en banc decision in Matteo provides the post AEDPA standard for reviewing a claim under S 2254(d)(1). Under Matteo, a habeas writ should not be granted "unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Matteo, 171 F.3d at 890. We noted in Matteo that Congress clearly intended

24

federal habeas courts to defer to reasonable state court adjudications of prisoners' claims: "Congress intended to restrict habeas relief to cases in which the state court judgment rested upon an objectively flawed interpretation of Supreme Court precedent." Id. We also held in Matteo that "federal habeas courts are [not] precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable." Id. With this standard in mind, we proceed to the merits of Hull's ineffective-assistance claim.

C. General Legal Principles

1. Ineffective Assistance of Counsel

The requirements for establishing ineffective assistance of counsel are well-known, and we need not belabor the general Strickland jurisprudence here. Hull must establish two elements to succeed on his claim: (1) that his counsel's performance regarding the competency issue was deficient, and (2) that the deficient performance prejudiced him by producing an unreliable result. See Strickland, 466 U.S. at 687. We have already held that Hull demonstrated thefirst prong, see Hull I, 932 F.2d at 168-69, and we see no reason to revisit that holding here. We thus confine our discussion to the issue of prejudice.

Before considering whether the deficient performance of Hull's trial counsel was prejudicial, we will briefly outline the relevant law regarding competency to stand trial. We do so not because we are deciding the underlying issue of whether Hull was competent to stand trial in 1979, but because the issue of prejudice is necessarily bound up in the law of competency: Whether Hull was prejudiced by his counsel's failure to cross-examine the government's single witness or to present any evidence of his possible incompetence is largely a function of whether Hull was in fact incompetent at the time. See, e.g., Eddmonds v. Peters, 93 F.3d 1307, 1317 (7th Cir. 1996) (framing the issue in a similar case as whether "there is a reasonable probability that [petitioner] was not fit [to stand trial], calling into question the integrity of the adversarial process"), cert.

25

denied, 520 U.S. 1172 (1997); Felde v. Butler, 817 F.2d 281, 282 (5th Cir. 1987) (noting that a petitioner would satisfy Strickland's prejudice prong "only if he demonstrates that there is a reasonable probability that but for[his counsel's] failure to seek a competency hearing, he would have been found incompetent to stand trial" (internal quotation omitted)).

Regardless of Hull's guilt or innocence, his constitutional right to effective counsel would be violated if he were convicted of first-degree murder when there was a reasonable probability that he was incompetent to stand trial. We reiterate also that, under the recent amendments to S 2254, we are not undertaking simply an independent analysis of this question. Rather, when a habeas petitioner presents a claim that has been "adjudicated on the merits in State court proceedings," 28 U.S.C. S 2254(d), the writ should not be granted "unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Matteo, 171 F.3d at 890.

2. Competence to Stand Trial

The basic rule for competency to stand trial is that a defendant must (1) have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) possess "a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation omitted); see also Pate v. Robinson, 383 U.S. 375, 385 (1966) (holding that failure to provide adequate procedures to ensure that the Dusky test is met deprives a defendant of his constitutional right to a fair trial).

Following Dusky and Robinson, the Supreme Court held in Drope v. Missouri, 420 U.S. 162 (1975), that a habeas petitioner's due process rights had been violated when a state court failed to determine his competency, notwithstanding his suicide attempt during trial, his wife's testimony at trial regarding his strange behavior, and a pretrial psychiatric evaluation that contained equivocal

26

evidence of incompetence. See id. at 175-80. A defendant presenting similar evidence of incompetency would presumably be prejudiced by either the trial court's failure to grant a competency hearing or his counsel's failure to request one.

Moreover, a defendant's right to be tried only when competent would presumably be violated if his counsel's conduct at a competency hearing was the virtual equivalent of failing to request a competency hearing in a case in which the indications of incompetency were as strong as they were in Drope. See also United States ex rel. McGough v. Hewitt, 528 F.2d 339, 342-43 (3d Cir. 1975) (relying on Drope and Robinson to hold that a petitioner was improperly denied "the opportunity to interrogate and cross-examine the psychiatrists" who had found him competent to stand trial, given that they reported his history of commitment in a state hospital "as a result of bizarre activities at his home," and his " `obsessive thinking and antisocial forms of behavior' "). Although the Superior Court did not cite any of these cases, this was the state of the law at the time of its 1988 decision denying Hull's state post-conviction petition, as well as at the time of the 1979 competency hearing.[6]

D. The Facts Regarding Hull's Incompetence

We emphasize that our task is not to determine whether there is a reasonable probability that Hull would not have been convicted, absent his counsel's errors. Rather, we are assessing whether there is a reasonable probability that he would have been found incompetent to stand trial if not for the deficient performance of his attorney. Therefore, it is

_____

6. In 1983, when the Supreme Court overturned a court of appeals' grant of habeas relief in a competency case, it noted that"[t]here is no dispute as to the proper legal standard to be applied for determining the correctness of the trial court's actions" regarding the petitioner's competency. Maggio v. Fulford, 462 U.S. 111, 116 (1983) (per curiam) (citing Robinson and Drope). Therefore, at the time of the Superior Court's decision on Hull's ineffective-assistance claim, Robinson and Drope remained the leading cases interpreting the requirements for competency to stand trial.

27

important to outline the relevant facts available to Hull's counsel at the time of his competency hearing. See Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir.) ("It isfirmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied."), cert. dismissed, 119 S. Ct. 2418 (1999).

1. The Medical Evaluations of Hull

In 1975, shortly after his arrest, Hull was found incompetent to stand trial. He was committed to Farview State Hospital, and given an initial medical diagnosis of borderline mental retardation and schizophrenia (chronic, undifferentiated type). In the first medical evaluation in the record, which occurred in March 1976, almost a year after Hull was committed to Farview, Dr. B.J. Willis reported:

> The staff was of the opinion that this patient continues to show clear signs of a disabling and dangerous mental condition that makes him a considerable risk. The staff was of the opinion that the patient is not now competent to stand trial and that he should be retained in the hospital for further treatment. It was the opinion of the staff that only the firm control and structure of this institution keeps the patient's behavior within bounds.

App. at 426.

Hull was evaluated again approximately five months later, on August 4, 1976, by Dr. Arthur D. Boxer. Dr. Boxer found that Hull still was not competent to go to trial. See id. at 427. Five months later, on January 12, 1977, Hull was evaluated by nine Farview staff members. Reporting on their evaluation, Dr. John P. Lesniak concluded that Hull "cannot participate in his own defense," that he was "potentially dangerous," and that he "still[was] not competent to stand trial." Id. at 428. Later that month, Dr. Donald N. Twaddell concluded that Hull "is hardly in a position to be considered competent to stand trial, to consult adequately with counsel, or to testify in his own defense." Id. at 429. Dr. Twaddell described Hull as "frequently and quite actively hallucinatory and disturbed

28

in both the auditory and visual areas with morbid thoughts of death." Id.

Five staff members evaluated Hull in May 1977, and concluded that Hull, "although improved, continues to be incompetent to stand trial at this time." Id. at 432. On February 15, 1978, Dr. Lawrence Chang reported:

> History indicates that [Hull] gives a picture of a mental defective who has been unable to read or write. He went as far as only the fourth grade at the age of 15. . . . He remains to be psychotic throughout his hospitalization here with the repeated episode of hearing voices telling him to kill someone and that God's voice tells him not to do harm to anyone . . .. His inability to comprehend the nature of his act is a product and manifestation of his mental illness and mental retardation. Therefore, he is not considered to be mentally competent to stand trial at this time. It is also further recommended that due to his both homicidal and suicidal tendencies, he should continue to be in a setting of maximum security for his own protection and of others.

Id. at 433. Dr. Chang evaluated Hull four more times during 1978, in April, June, August, and October. See id. at 434–37. Each time he concluded that Hull remained incompetent to stand trial due to "his chronic mental illness and limited mental capacity." Id. at 437. In November 1978, Dr. J. Michael Shovlin suggested that Hull might be having "a psychotic depressive reaction" to Lithium Therapy, and concluded that Hull was still incompetent to stand trial. Id. at 438. Dr. Chang evaluated Hull again in January 1979 and found his condition unchanged, noting that "he has been undergoing numerous psychotropic drug therapies, without noticeable improvement," since his admission to Farview. Id. at 439.

On April 9, 1979, less than two weeks before the court-appointed psychiatrist, Dr. Stamey, evaluated Hull (and later testified that he was competent to stand trial), Dr. Kenneth Detrick reported that Hull's condition "does not seem to be appreciably different from any of the other examinations." Id. at 440. He concluded that "his mental

incapacity continues to be so severe that he remains incompetent to stand trial for his crime and should continue at Farview State Hospital for further treatment." Id.

On April 20, 1979, at the request of the Franklin County Court of Common Pleas, Dr. Stamey evaluated Hull, and on May 4, 1979, the doctor sent his report to the court. In his report, Dr. Stamey noted that Hull's "thoughts were logical and coherent and goal directed, and somewhat forceful." Id. at 443. He also found Hull's affect "appropriate, but shallow." Id. Dr. Stamey did not find Hull to be suicidal. See id. He reported that Hull had "some [insight], but not much," and that Hull was "a relatively simple soul, not a deep thinker or feeler." Id. at 444. Dr. Stamey found that Hull's judgment was "good within his intellectual limits," but that "under increased stress it might break down." Id. Although Hull's schizophrenia appeared to Dr. Stamey to be "in a degree of remission" at that time, he found the remission "fragile," and noted that Hull "has very little in the way of coping mechanisms, still harbors a good bit of suspicion, and is very defensive in many areas." Id. at 445.

In conclusion, Dr. Stamey opined that Hull was "competent to stand trial and probably would remain so throughout the trial if it is not overly stressful." Id. He thought it "worth a try," though he cautioned that Hull should be watched closely for "signs of regressing." Id. Specifically regarding the two requirements of competency, Dr. Stamey noted that Hull had "some intellectual and emotional understanding of the charges, what might happen to him because of them, and what the alternatives are," and that Hull "could help his lawyer within the limits of his intelligence." Id. However, he qualified his opinion by noting that Hull "could regress very quickly and become incompetent" under even a small amount of stress. Id.

On May 3, 1979, Hull was evaluated again, and found incompetent to stand trial by Farview staff. See id. at 446–53. In the final medical evaluation prior to the competency hearing, on July 23, 1979, Dr. Norman E. Wenger expressly disagreed with Dr. Stamey's conclusion regarding Hull's competency to stand trial, and recommended that Hull

30

"receive another period of in-patient, psychiatric hospitalization at this facility." Id. at 454.

Following the court's adjudication of Hull as competent to stand trial on July 31, 1979, see infra Part IV.D.2, and Hull's general guilty plea on August 3, 1979, his trial counsel requested (and the court apparently ordered) a psychiatric evaluation of Hull in preparation for the degree-of-guilt hearing. As a result, on August 15, 1979, Dr. Robert L. Sadoff evaluated Hull. The focus of Dr. Sadoff 's evaluation appears to have been on Hull's state of mind at the time of the crime, not at the time of the competency hearing. See App. at 456-60. Dr. Sadoff concluded that Hull had acted with diminished mental capacity at the time of the shooting, and closed his report with these words:

> Whatever the final determination by the court about the degree of homicide, it is my strong recommendation that Mr. Hull be treated intensively in a hospital setting for a prolonged period of time. The combination of his illness, borderline mental retardation and poor impulse control, with alcoholism is a potentially explosive and violent combination which requires security measures as well as medication and a therapeutic environment. At one level Mr. Hull is aware of the situation in which he is involved to the point that he wants to be put to death by the State for what he says he has done. He says, "I don't deserve to live." On the other hand, he wants to live and wants to engage in constructive rehabilitative efforts. However, these efforts will be long-term and his recovery will be slow and the remission is fragile at the present time. Moderate degrees of stress will be sufficient to cause further decompensation and deterioration in Mr. Hull's condition. He will require continued medication as well as security treatment.

Id. at 460-61.

As for Hull's then-current state of mind, Dr. Sadoff noted that Hull "believes that he is competent" and "believes that he should be found guilty and should be given the death penalty for what he did." Id. at 455. Dr. Sadoff concluded that "Hull is mentally competent to proceed in this legal

31

situation. He understands the nature and consequences of his legal condition and can work with counsel in preparing a rational defense." Id. at 459. At this point, however, Hull had already been adjudicated competent (as his counsel had requested, see id. at 424), and his guilty plea to murder had been accepted.

## 2. The Competency Hearing

The competency hearing was held on July 31, 1979. Despite the 1975 finding that Hull was incompetent, and the veritable phalanx of medical reports that Hull remained incompetent, the entire hearing took less than an hour and is reproduced in only four pages of transcript. See id. at 421–24. As noted above, only one witness, Dr. Stamey, testified. Because of its central importance in this case, we include in the margin the entire transcript from the competency hearing.7

(Text continued on page 34)

_____

7. The competency hearing began with the government calling Dr. Stamey to the stand:

 BY MR. WALKER [the District Attorney]:

 Q Dr. Stamey, what is your occupation?

 A I am a physician, psychiatrist.

 Q Are you associated with any hospital?

 A A senior vice president and medical director of the Geisinger Medical Center in Danville.

 Q Dr. Stamey, where did you do your undergraduate work?

 A At George Washington University.

 Q Where did you do your medical training?

 A Also at George Washington University.

 MR. MARTIN [Hull's trial counsel]: Your Honor, we will stipulate to Dr. Stamey as being a psychiatrist.

 THE COURT: Very well.

 BY MR. WALKER:

 Q Dr. Stamey, going back to April 20, 1979, did you have

occasion to evaluate Larry Gene Hull?

32

A Yes, sir.

Q Is Larry here in the courtroom today?

A Yes.

Q Where is he seated?

A Right there (indicating.)

Q Where was that evaluation at?

A At the Farview State Hospital in Waymart.

Q From your evaluation of Mr. Hull on that date, were you able to form an opinion as to whether Mr. Hull would be able to understand the nature or object of the proceedings against him?

A Yes, sir.

Q What is that opinion?

A I feel that he could.

Q What is your opinion as to whether or not Mr. Hull would be able to participate and assist in his defense?

A At that time I felt that he could do so.

MR. WALKER: I have no further questions.

THE COURT: Cross examine.

MR. MARTIN: We have no questions, Your Ho nor.

THE COURT: Do you understand, Mr. Hull, t hat your attorney has the right to cross examine the doctor to find out what it was that formed the basis of the doctor's opinion as he has reported it.
Do you understand that?

THE WITNESS [Hull]: Yes, I do.

THE COURT: And understanding that, had yo u told your attorney that you do not request him to cross examine the witness?

THE WITNESS: Yes.

THE COURT: All right, thank you very much. You may be seated.

MR. WALKER: Your Honor, that is all that we have for the

Commonwealth's case.

At the hearing, the government asked Dr. Stamey only two substantive questions: Whether he believed "Hull would be able to understand the nature or object of the proceedings against him," id. at 422, and whether "Hull would be able to participate and assist in his defense," id. at 423. To the first question, Dr. Stamey answered, "I feel that he could." Id. In response to the second question, regarding Hull's assisting in his defense, Dr. Stamey apparently referred to his evaluation of Hull approximately three months earlier: "At that time I felt that he could do so." Id. Dr. Stamey did not elaborate on either answer, and was asked no further questions by the district attorney. Hull's counsel, when asked by the court to cross-examine Dr. Stamey, responded, "We have no questions, Your Honor." Id.

The Commonwealth presented no other evidence of Hull's competence. There is also no indication in the record that the government introduced Dr. Stamey's report into evidence. When the government stated that it had no additional evidence or witnesses to present, the court asked Hull's counsel if he had any evidence to present. He responded, "No, we have none." Id. At this point, the court

_____

    THE COURT: Do you have any evidence to pr esent, Mr. Martin?

    MR. MARTIN: No, we have none.

    THE COURT: All right, we will make an ord er. Mr. Martin, is there any objection to our making an order finding Mr. Hull competent to stand trial?

    MR. MARTIN: No objection, Your Honor. In fact, we have agreed to it.

    THE COURT: You request it?

    MR. MARTIN: Yes.

App. at 421-24.

The record reflects that the court then entered an order. Following a sidebar discussion off the record, the court set a trial date of September 10, 1979, and remanded Hull to Franklin County Prison pending trial. See id. at 424.

34

entered an order finding Hull competent to stand trial, which Hull's counsel expressly "agreed to." Id. at 424.

E. Prejudice to Hull

Initially, we reiterate that under AEDPA and Matteo, we must look at the last state court decision on the merits of a petitioner's claim to determine if that decision,"evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Matteo, 171 F.3d at 890. The last state court decision on the merits of Hull's ineffective-assistance claim is the Superior Court's 1988 decision. That decision, "evaluated objectively and on the merits," reveals little discussion of the issue before us--prejudice under Strickland. The only aspect of the court's opinion that appears to refer to this issue is its determination that the colloquy at Hull's guilty plea on August 3, 1979, demonstrated his "ability to recount in detail his actions and emotions at the time of the murder," Commonwealth v. Hull, No. 215 Harr. 1988, slip op. at 3-4 (Pa. Super. Ct. Sept. 30, 1988), which established both his ability to assist his counsel and his understanding of the proceedings against him, see id. at 4.8

Under Strickland, a petitioner alleging prejudice from his counsel's deficient performance "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to

_____

8. The Common Pleas Court's decision on this issue, included in its opinion and order of February 22, 1988, contains a similar analysis. See Commonwealth v. Hull, Crim. No. 101-1975, slip op. at 9 (Pa. C.P. Ct. Feb. 22, 1988) ("We have independently reviewed defendant's testimony at the guilty plea proceeding . . ., and note that defendant testified in a
cogent, coherent manner, giving no indication whatever of incompetency at the time of such testimony."). We note incidentally that the Common Pleas Court assumed--incorrectly in our view--that the burden remained on Hull to rebut the presumption of competence with clear-and-convincing evidence, despite the earlier adjudication that found him incompetent to stand trial. See id. at 9-10; cf. supra Part I.A.

undermine confidence in the outcome." Id. This standard "is not a stringent one." Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999) (citing Nix v. Whiteside, 475 U.S. 157, 175 (1986)). It is less demanding than the preponderance standard. See id. Therefore, to prove that he was prejudiced by his counsel's performance, Hull need not demonstrate that he definitely was incompetent in 1979. Rather, he must only establish that there was a reasonable probability that he was.

Applying this standard from Strickland and our interpretation of S 2254(d)(1) from Matteo, we conclude that it was objectively unreasonable for the Superior Court to implicitly find that there was no "reasonable probability" that the outcome of Hull's competency hearing would have been different if not for his counsel's failure to cross-examine Dr. Stamey or to present evidence in support of Hull's incompetence.

Supreme Court precedent as of 1988 clearly required more of a state court than the summary conclusion that the Superior Court drew from the plea colloquy. 9 Pate v. Robinson, decided more than a decade before Hull's competency hearing, required states to provide adequate procedures to ensure that only competent defendants were tried (and convicted). Drope v. Missouri, also decided before the competency hearing and well before the Superior Court's 1988 decision, held that a habeas petitioner's due process rights were violated when a state court did not consider evidence of his incompetence, even though his incompetence was far from certain. Indeed, in 1975, we relied on these two cases in McGough to find that a habeas petitioner's constitutional rights were violated when he was not given the opportunity to cross-examine psychiatrists who deemed him competent to stand trial--one of the bases on which we have found that Hull's trial counsel was deficient. See Hull I, 932 F.2d at 168; cf. Matteo, 171 F.3d at 890 ("[F]ederal habeas courts are [not] precluded from considering the decisions of the inferior federal courts when

_____

9. We note that both Strickland and Whiteside, as well as the competency cases discussed supra Part IV.C.2, were decided before the Superior Court's consideration of Hull's ineffective-assistance claim in 1988.

36

evaluating whether the state court's application of the law was reasonable.").

These cases unequivocally provide that a criminal defendant is entitled to adequate procedures, including the opportunity to present evidence and to cross-examine government witnesses, when his competency is at issue. When a defendant has not only already been found incompetent to stand trial, as Hull was before the 1979 competency hearing, but when numerous evaluations of his mental condition indicate that he remains incompetent, his competency to stand trial must be carefully considered by the court before a trial may be held or a guilty judgment entered. Under these circumstances, when a defendant's own attorney fails to effectively use the procedures to determine competency that are mandated by Supreme Court precedent, we believe that the prejudice to the possibly still-incompetent defendant is manifest.

The state courts did not discuss at length the evidence regarding Hull's competence. The District Court did outline Dr. Stamey's findings, and observed that the many doctors who found Hull incompetent "addressed Hull's past condition and not his condition as of the date of the hearing." Hull v. Freeman, Civ. No. 89-0681, slip op. at 14-15 (M.D. Pa. Oct. 18, 1991). However, four of the evaluations occurred in 1979, within six months of the competency hearing, and fifteen different evaluations between 1976 and 1979 found Hull incompetent while only the single evaluation of Dr. Stamey resulted in afinding of competency. Dr. Stamey's opinion, moreover, was not based on Hull's condition on the date of the hearing, but on his evaluation of Hull more than three months earlier. Even a short, simple cross-examination could have highlighted this fact, as well as Dr. Stamey's own concessions that Hull "could regress very quickly and become incompetent," and that his putative remission was "fragile" (and might have already shattered in the three months since the doctor's observation of Hull).

The District Court acknowledged that "Dr. Stamey's written report was not admitted into evidence at the competency hearing," id. at 5, though it discussed the report at length before rejecting Hull's claim, see id. at 11-

37

13. However, when determining whether there is a "reasonable probability" that the Common Pleas Court would have reached a different conclusion in the absence of counsel's inadequate performance, we should not assume that it considered Dr. Stamey's report in reaching its actual conclusion. Cf. Meyers v. Gillis, 142 F.3d 664, 669 (3d Cir. 1998) ("[W]e cannot go beyond the record to refute [petitioner's] assertion of prejudice."). In fact, the record does not reveal that the Common Pleas Court considered any of the reports on Hull's competency and arguably it would have had no reason to do so once Hull's counsel "agreed" at the competency hearing that Hull was competent to stand trial. We note, however, that Hull was found incompetent on three different occasions in mid-1979, including twice after Dr. Stamey's evaluation and before the competency hearing.

It is not certain that the state court would have found Hull incompetent on the basis of this evidence from the mid-1979 evaluations (or even on the basis of the twelve previous evaluations that found him incompetent, and the detailed descriptions of his psychosis and mental illness in all of the evaluations). But we have no trouble finding that there is a reasonable probability that the court would have determined that Hull had not regained his competence to stand trial if this evidence had been presented by Hull's counsel, and if Dr. Stamey had been pressed even slightly on the qualified and equivocal nature of his report's conclusions.

At the juncture of the dual constitutional requirements of effective assistance of counsel and a defendant's competency, the Supreme Court has implied that defense counsel has a special role in effectively ensuring that a client is competent to stand trial. See Drope, 420 U.S. at 177 n.13 ("Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, an expressed doubt in that regard by one with `the closest contact with the defendant,' is unquestionably a factor which should be considered." (citations omitted)). Defense counsel's special role arises not only from the typical attorney-client relationship, but from the very fact that the

38

defendant may be unable to appreciate the proceedings or to assist his attorney (or to make an intelligent decision on challenging his competency). Cf. Robinson, 383 U.S. at 384 ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently `waive' his right to have the court determine his capacity to stand trial."). Hull would clearly appear to have been prejudiced by his counsel's failure to "express[ ] doubt" regarding his competency by cross-examining the government's single witness or presenting any of the large body of evidence in support of Hull's incompetence to stand trial.

In Strickland, the Court noted that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. We think it abundantly clear that counsel's conduct at the competency hearing in this case, given the demonstrated and overwhelming evidence of Hull's incompetence, "undermined the proper functioning of the adversarial process" of a competency hearing, which was required (in 1979) by Supreme Court precedent and the Due Process Clause, so that we cannot say that a just result--i.e., the conviction of a competent and guilty defendant--occurred. This certainly is not a case in which we can say that prejudice did not result from counsel's failure to act because counsel took sufficient alternative steps to ensure that defendant was adequately represented. Cf. Hess v. Mazurkiewicz, 135 F.3d 905, 909 (3d Cir. 1998) (holding that a defendant suffered no prejudice from counsel's failure to call certain alibi witnesses because his counsel had "presented a plausible, if ultimately unsuccessful, alibi defense" through other witnesses).

Finally, we note that prejudice to a defendant is presumed when his counsel's performance is so deficient as to effectively constitute a denial of the right to counsel. See Strickland, 466 U.S. at 692. In this case, despite the strong evidence of Hull's incompetence (evidence that could presumably be presented only by counsel), Hull's trial counsel "agreed" at the conclusion of the competency hearing that Hull was competent to stand trial. This is

39

essentially tantamount to "constructive denial of the assistance of counsel altogether[, which] is legally presumed to result in prejudice." Id. The order of the District Court must therefore be reversed and the case remanded with instructions to grant the writ.

V. Conclusion

When Hull was first granted the writ by the district court in 1990, that court appeared to believe that the state court should readjudicate Hull's competency to stand trial as of 1979, effectively redoing the flawed competency hearing. However, in Hull I, we explained that if Hull's ineffective-assistance claim was not procedurally defaulted and if he proved prejudice from his counsel's deficient performance, the writ should be granted conditioned on his being retried --not conditioned on his competency in 1979 being readjudicated. We believe this remains the proper disposition of Hull's successful habeas petition.

The state may retry Hull if it chooses, and the writ will be granted conditioned on his retrial within 120 days. Because he was found incompetent to stand trial at his last valid competency hearing (in 1975), the state must first establish that Hull has presently regained his competency to stand trial before retrying him. At this point, his actual competency as of 1979 is irrelevant to any criminal proceedings against him. See Dusky, 362 U.S. at 403 (remanding to the trial court "for a new hearing to ascertain petitioner's present competency to stand trial," given "the . . . difficulties of retrospectively determining the petitioner's competency as of more than a year ago"); see also Drope, 420 U.S. at 183 (same, when competency hearing was held six years before writ was granted); Robinson, 383 U.S. at 387 (same).

For the foregoing reasons, the judgment of the District Court will be reversed and the case remanded for the granting of a writ of habeas corpus conditioned on Hull's being retried within 120 days, with the understanding that, if Hull cannot be tried within this period because he is found incompetent to stand trial, the state has at its disposal procedures for treating Hull, see Pa. Stat. Ann. tit.

40

50, SS 7401-7407 (West Supp. 1999), and it may retry him within 120 days of his regaining his competency to stand trial should he do so.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

41