BATCHELDER, C.J., delivered the opinion of the court, in which McKEAGUE, J., joined. MOORE, J. (pp. 447-59), delivered a separate dissenting opinion.
OPINION
ALICE M. BATCHELDER, Chief Judge.
Raymond Tibbetts, an Ohio death row inmate represented by counsel, appeals the district court’s decision to deny his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. A certificate of appealability (“COA”) was granted for three claims: (1) whether trial counsel was ineffective for failing to develop and present evidence about Tibbetts’ mental status at the penalty phase; (2) whether trial counsel was ineffective for failing to present mitigating evidence at the penalty phase; and (3) whether counsel on direct appeal was ineffective for failing to argue that the trial court did not consider all relevant information to support the imposition of a sentence less than death. We AFFIRM the district court’s decision to deny the petition for a writ of habeas corpus because we find that the efforts of Tibbetts’ trial counsel were not constitutionally deficient and because any failure of the trial court to consider relevant mitigation evidence was cured by the Ohio Supreme *438 Court’s independent reweighing of the relevant mitigating factors.
BACKGROUND
In 1998, a Hamilton County, Ohio, jury found Tibbetts guilty on three counts of aggravated murder, one count of murder, and one count of aggravated robbery, in connection with the robbery and murder of James Hicks and Susan Crawford. Each guilty verdict for the aggravated murder and murder counts contained two death penalty specifications: that the offense was committed during the course of an aggravated robbery; and that the offense included the murder of two or more persons. The Ohio Supreme Court summarized the facts as follows:
On November 6, 1997, Hicks’s sister, Joan Hicks Landwehr, arrived at Hicks’s home in Cincinnati to meet him for lunch. Landwehr often visited Hicks, who was sixty-seven years old and suffered from emphysema. Due to his condition, Hicks employed Crawford as a live-in caretaker. Tibbetts, who had married Crawford just over a month earlier, also lived in the house.
After getting no answer at the door and seeing Hicks’s car missing from its usual parking space, Landwehr entered the home with her spare key. Landwehr went to a second-floor living room and found Hicks’s dead body slumped in a chair. Landwehr immediately called 911. Landwehr noticed that her brothers’ chest and stomach were bloody and that his right pants pocket, where Hicks usually kept his money, was turned inside out.
When Cincinnati police officers responded a short time later, they found Hicks with a tube still connecting his nose to a nearby oxygen tank. Two knives protruded from Hicks’s chest, a third knife protruded from his back, and the broken blade of a fourth knife was also in his back. Officers found additional knives and a knife sheath near Hicks. A butcher block used to store knives lay behind Hicks’s chair. Deputy coroner Daniel Schultz later determined that Hicks died as a result of multiple stab wounds to his chest that punctured Hicks’s heart, lungs, and aorta. Hicks did not have any defensive wounds.
Officers searched the rest of the house and found Crawford lying dead on the floor of a third-floor room, covered with a sheet. Crawford had been brutally beaten; her head was cracked open and lay in a pool of blood. Pieces of Crawford’s brain were lying on the floor next to her head. Crawford had also been stabbed several times, with one knife still stuck in her neck. Crawford also had a broken left arm, which Dr. Schultz characterized as a probable result of her attempt to ward off blows. Police found a bloodstained baseball bat and several knives near Crawford’s body. Dr. Schultz concluded that Crawford died of multiple skull fractures and that at least nine of her stab wounds were inflicted after her death. In all, Crawford had been struck at least four times in the head with blunt-force blows and sustained stab wounds to her back, lungs, chest, arm, shoulder, and neck.
Dr. Schultz, who also investigated the crime scene, determined that Hicks and Crawford had been dead for several hours. Police investigators found no identifiable fingerprints on the baseball bat or the knives. The only fingerprints found in the house belonged to either Tibbetts or Crawford. There were no signs of forced entry anywhere in the residence. Police also learned from Landwehr and others at the scene that Hicks’s car, a white Geo Metro, was missing. Landwehr told police that Tib *439 betts did not have permission to drive the car.
The day after discovering the bodies, Cincinnati police learned that a Covington, Kentucky police officer had stopped Tibbetts on the night of the murders. Just after midnight on November 6, 1997, Covington police lieutenant Michael Kraft found Tibbetts in a white Geo Metro that had broken down in the middle of an intersection. According to Kraft, Tibbetts appeared nervous and “smelled somewhat of intoxicants.” Tibbetts also lied to Kraft about the car’s owner, saying that the car belonged to a friend in Covington.
Kraft summoned another officer to the scene to assist Tibbetts and investigate whether Tibbetts was driving under the influence of alcohol or drugs. Officer David Finan arrived a short time later and also noted that Tibbetts was nervous and smelled of intoxicants. He allowed Tibbetts to go, however, after concluding that Tibbetts was not under the influence of alcohol or drugs. The car was towed away and impounded by Covington police. Cincinnati police later recovered the Geo Metro from the Covington impoundment lot and found bloodstains on the steering wheel, gearshift, door panel, and brake handle.
After learning of the Covington police’s encounter with Tibbetts, Cincinnati police charged Tibbetts with receiving stolen property and obtained an arrest warrant on November 7, 1997. The very next day, Tibbetts voluntarily admitted himself to the psychiatric unit at St. Elizabeth Hospital in Edgewood, Kentucky. Tibbetts told nurses that his name was Ray Harvey and provided an incorrect Social Security number. Despite the false name and identification information, nurses at the psychiatric unit recognized Tibbetts from his previous treatment at the hospital. On the same day that Tibbetts checked into St. Elizabeth, police arrested Tibbetts on the warrant for receiving stolen property and took him to a local jail for questioning.
Tibbetts signed a waiver of his Miranda rights and calmly cooperated with the two investigating officers who questioned him. Tibbetts had a noticeable cut on his hand and told the investigators he had cut his hand on a river barge where he had been staying. When an officer asked whether Tibbetts had seen his wife lately, Tibbetts responded that he had not and then terminated the interview. As police were leaving, Tibbetts queried, ‘What’s the charge, manslaughter?” The investigators, who had not mentioned the murders to Tibbetts during the interview, responded that the matter was under investigation.
A few days later, a Cincinnati police officer retrieved from St. Elizabeth the clothing Tibbetts was wearing when he checked himself into the psychiatric unit and took it to the crime lab for DNA testing. The socks, T-shirt, and blue jeans Tibbetts was wearing on November 8, 1997, were all stained with human blood. A serologist found that the blood on Tibbetts T-shirt matched Tibbetts’s blood, that blood on the socks matched Hicks’s blood, and that blood on the blue jeans matched blood from Tibbetts, Crawford, and an unknown person. The serologist also analyzed blood found in the Geo Metro and concluded that blood on the door, brake handle, and gearshift matched Tibbetts’s blood.
State v. Tibbetts, 92 Ohio St.3d 146, 749 N.E.2d 226, 237-39 (2001).
In preparation for the penalty phase, trial counsel hired a mitigation specialist, James Crates, and a forensic psychiatrist, Dr. Glen Weaver. Crates obtained numer *440 ous records from the Hamilton County Department of Children Services; St. Elizabeth, Eastgate Psychiatric Center; Anderson High School; Forest Hill School District; Live Oaks Career; Transitions, Inc./Droege House; and McGuinness Corp., Tibbetts’ former employer. Crates also contacted and interviewed members of Tibbetts’ family. Dr. Weaver met with Tibbetts on three occasions, each meeting lasting between two and two and a half hours. Apart from Tibbetts’ own unsworn statement to the jury, Dr. Weaver was the only witness called during the penalty phase, and he testified primarily as to Tibbetts’ upbringing and his difficulties with drugs and alcohol.
Dr. Weaver characterized Tibbetts’ childhood as “miserable,” detailing his parents’ use of drugs and his father’s abuse of alcohol. Dr. Weaver testified that Tibbetts was removed from his parents’ home and placed into foster homes. Dr. Weaver described those foster homes as “punitive” and related that Tibbetts’ sister had said that Tibbetts and his brothers “were tied in bed at night so they would not be any problem. No sheets, no pillows, no pillow case or anything. Treated more like animals. There wasn’t any touching of him or the other sibling. Matter of fact, there was no touching even with his own parents.” Dr. Weaver testified that Tibbetts was “essentially damaged goods when he was as [young] as five years old,” and testified that his formative years “were certainly lacking in most respects.” Dr. Weaver stated that Tibbetts had trouble controlling his impulses, and attributed that trouble to his difficult upbringing. Dr. Weaver testified that Tibbetts never received any psychiatric testing or treatment while a child, even though he was in the care of the state.
Dr. Weaver testified that Tibbetts started using drugs and alcohol when he was a fourteen-year-old resident of General Protestant Orphan Home. He had been playing high school football and was injured during a game. Dr. Weaver testified that Tibbetts’ drug use began shortly after the injury; that Tibbetts entered a drug treatment facility in approximately 1993, and was able to remain sober for a while; but that a workplace injury required heavy painkillers which led to his return to drug abuse. Dr. Weaver also testified that Tibbetts’ substance abuse led to the end of a common-law marriage, and was exacerbated by a second marriage to a woman who also abused drugs and died shortly after they married.
Dr. Weaver testified that he administered the Minnesota Multiphasic Personality Test II to Tibbetts and learned that he was “an individual with limited personality resources or a personality control. That he was subject to instances of explosiveness rage. And that, particularly, with the use of alcohol or with drugs, he would have no ability to control the impulses which he might feel.” According to Dr. Weaver, the test results also suggested that “he might exhibit features of hysterical episode. For example, he might even have dissociative episodes which he might do things which he would have no recall for later.” Dr. Weaver testified that, on the night of the murders, Tibbetts experienced just such a dissociative reaction, which comports with Tibbetts’ own testimony at trial that he remembered nothing of the night of the murders. Dr. Weaver also testified that Tibbetts had a reduced capacity either to appreciate the criminality of his actions or to refrain from those activities.
Dr. Weaver testified that Tibbetts could barely control his behavior while under stress when he was sober, and that his use of some combination of alcohol or drugs was “just like an explosion waiting to happen.” Dr. Weaver explained that Tibbetts *441 could become a productive individual if he was able to receive treatment in a prison setting, which would diminish his propensity for inappropriate violence.
The jury recommended that Tibbetts be given a sentence of death for the murder of Hicks and a sentence of life imprisonment without parole for the murder of Crawford. The trial court adopted the recommendation of the jury on August 27, 1998, sentencing Tibbetts to ten years for aggravated robbery, life without parole on the murder conviction, and death for the three aggravated murder convictions. Tibbetts appealed his conviction and sentence to the Ohio Supreme Court, alleging fifteen claims for relief. The Ohio Supreme Court denied all of Tibbetts’ claims and affirmed the conviction and sentence, after re-weighing all of the aggravating and mitigating factors. Tibbetts then unsuccessfully sought post-conviction relief in state court, and the Ohio Supreme Court declined further review. Tibbetts filed an application to re-open his direct appeal, which was also denied.
In February 2003, Tibbetts filed a petition for a writ of habeas corpus in the district court. The district court denied his petition, but granted a COA on three claims. First, Tibbetts claims that his trial counsel was ineffective for failing to develop and present evidence of Tibbetts’ mental status at the time of the crime during the penalty phase. Tibbetts argues that he was entitled to the have a pharmacological expert testify as to the effect of alcohol and drugs on Tibbetts’ mental state and, specifically, his ability to control his rage impulse. Second, Tibbetts claims that his trial counsel was ineffective for failing to present mitigating evidence at the penalty phase. Tibbetts argues that trial counsel failed to make a reasonable investigation into Tibbetts’ childhood, failed to provide any evidence to corroborate the testimony offered by Dr. Weaver, and that, consequently, vital information about Tibbetts’ childhood was never heard by the jury. Third, Tibbetts argues that his appellate counsel was ineffective for failing to raise, on direct appeal to the Ohio Supreme Court, that the trial court failed to consider valid mitigation evidence. Tibbetts argues that the trial court failed to consider a number of factors that were recognized by the Ohio Supreme Court, and that the Ohio Supreme Court’s reweighing of mitigation factors was insufficient to cure the error.
ANALYSIS
We review a district court’s denial of a petition for writ of habeas corpus de novo. Tolliver v. Sheets, 594 F.3d 900, 915 (6th Cir.2010). Because Tibbetts filed his petition after April 24, 1996, it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”). Carter v. Mitchell, 443 F.3d 517, 524 (6th Cir.2006). Under AEDPA, a writ may not be granted unless the state court’s adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254(d)(1)-(2). Factual determinations made by the state courts are presumed to be correct unless rebutted by clear and convincing evidence. Id. § 2254(e)(1).
“A state court renders an adjudication ‘contrary’ to federal law when it ‘arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of lav/ or ‘decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.’ ” Biros v. Bagley, *442 422 F.3d 379, 386 (6th Cir.2005) (quoting Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). “A state court unreasonably applies Supreme Court precedent ‘if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular prisoner’s case.’ ” Barnes v. Elo, 339 F.3d 496, 501 (6th Cir.2003) (quoting Williams, 529 U.S. at 407, 120 S.Ct. 1495). “In order for a writ to issue, we must determine both that the state court incorrectly applied the relevant Supreme Court precedent and that this misapplication was objectively unreasonable.” Tolliver, 594 F.3d at 916.
We emphasize that AEDPA sets forth a heavy burden for a petitioner to overcome. “The question under AEDPA is not whether a federal court believes the state court’s determination was incorrect but whether that determination was unreasonable — a substantially higher threshold.” Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). A state court determination is not unreasonable “simply because [a federal court] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.” Williams v. Taylor, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Rather, the state court’s application of clearly established Supreme Court precedent must be “objectively unreasonable.” Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002).
When reviewing ineffective-assistaneeof-counsel claims, we engage in a two-part inquiry.
First, the defendant must show that counsel’s performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose results are reliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel’s performance is constitutionally deficient if it falls below an objective standard of reasonableness. Phillips v. Bradshaw, 607 F.3d 199, 208 (6th Cir.2010). “The burden is on the defendant to make such a showing by identifying the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,” id. at 209, and “a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance,” Strickland, 466 U.S. at 689, 104 S.Ct. 2052. To establish prejudice, Tibbetts must show that a reasonable probability exists that, but for counsel’s deficient performance, the result of the proceedings would have been different. Phillips, 607 F.3d at 217.
Our review utilizes both the Strickland and AEDPA standards. Even if we were to conclude that counsel’s performance fell below an objective standard of reasonableness, and that a reasonable probability exists that, but for that failure, the result of the proceeding would have been different, we must still ask whether the state court’s conclusion to the contrary was “objectively unreasonable.”
I. Failure to develop and present evidence of Tibbetts’ mental state
Tibbetts argues that his trial counsel was constitutionally deficient because he failed to call an expert in pharmacology during the penalty phase. At an evidentiary hearing before the district court, Tib *443 betts presented the testimony of Charles T. Kandiko, Ph.D., a pharmacologist, and Janice Ort, Psy.D., a clinical psychologist. At the hearing, Dr. Kandiko testified that he believed that Tibbetts was impaired the day of the murders, and that his aggressive actions were an effect of the combination of cocaine and alcohol. Dr. Kandiko also testified that it is possible that memory can be affected by ingesting various substances, and that there is evidence that someone could have an aggressive period while under the influence of cocaine, and then not have any memory of it later. Dr. Ort conducted additional psychiatric tests on Tibbetts, to test his mental state. She testified that a full understanding of Tibbetts’ mental state would only have been possible with the input of an expert pharmacologist. Dr. Ort offered additional testimony regarding Tibbetts’ mental state, based on the testimony offered by Dr. Kandiko and the additional tests she conducted.
In White v. Mitchell, 431 F.3d 517 (6th Cir.2005), this court rejected a claim almost identical to the one brought here,[1] stating that we “[did] not find a meaningful difference in the two diagnoses as they pertain to the legal considerations relevant here, and therefore, we find that [Petitioner] cannot show prejudice as a result of his trial counsel’s performance.” Id. at 529-30. Dr. Weaver’s testimony covered each subject Petitioner claims was necessary for a constitutionally adequate defense, including that Tibbetts’ use of drugs and alcohol was an explosion waiting to happen, and that Tibbetts was unable to control his rage response while intoxicated. Tibbetts argues, however, that Dr. Weaver could not have provided the detailed testimony needed because he was not a trained pharmacologist. For the purposes of the penalty phase of Tibbetts’ trial, this is a distinction without a difference. See, e.g., Clark v. Mitchell, 425 F.3d 270, 285 (6th Cir.2005) (holding that trial counsel was not ineffective for failing to retain a pharmacologist because a mental health expert testified at trial about the defendant’s drug addiction).
We cannot conclude that a habeas petitioner is entitled to the testimony of every qualified expert who might possess some specialized knowledge regarding the petitioner’s case. Because there is no meaningful difference between the testimony of Dr. Weaver and the proposed testimony of Dr. Kandiko, at least as they pertain to the legal considerations before the trial court during the penalty phase, Tibbetts cannot show prejudice as a result of his trial counsel’s performance. We therefore affirm the district court’s denial of relief on this claim.
II. Failure to investigate and present mitigating evidence at the penalty phase
In his second claim, Tibbetts argues that trial counsel failed to conduct an adequate investigation into his past. A more thorough investigation, Tibbetts argues, would have allowed greater detail regarding his childhood to be presented to the jury. Tibbetts also faults his trial counsel for failing to call any witnesses to corroborate the testimony of Dr. Weaver. When the adequacy of trial counsel’s investigations are at issue we must consider the extent to which limitations on the investigation are supported by reasonable professional judgments. Strickland, 466 U.S. at 690, 104 S.Ct. 2052. “In other words, counsel has a duty to make reasonable *444 investigations or to make a reasonable decision that makes particular investigations unnecessary.” Id. As stated previously, we must apply “a heavy measure of deference to counsel’s judgments” and Tibbetts “must overcome the presumption that, under the circumstances, challenged action might be considered sound trial strategy.” Id. at 689, 104 S.Ct. 2052.
Tibbetts relies heavily on our case law that establishes that trial counsel may be constitutionally deficient if an investigation is not conducted in preparing mitigation evidence. See, e.g., Glenn v. Tate, 71 F.3d 1204, 1207 (6th Cir.1996) (declaring that trial counsel was objectively unreasonable when they “never took the time to develop [mitigation evidence]” and “made virtually no attempt to prepare for the sentencing phase of trial”). However, the record here clearly shows that trial counsel engaged in an investigation of mitigating factors, including Petitioner’s family history, psychological background, and every other category to which Petitioner now claims he was entitled. While trial counsel certainly could have conducted a more thorough investigation, we cannot say that the investigation was constitutionally deficient.[2]
Moreover, Dr. Weaver testified at length about the awful state of Tibbetts’ childhood. As noted, Dr. Weaver testified that Tibbetts’ parents both used drugs and that Tibbetts was removed from his home at an early age and placed into foster homes. Dr. Weaver also painted a grim picture of Tibbetts’ life in those foster homes, concluding that he was treated more like an animal, tied up at night, etc. While it is true that Dr. Weaver’s testimony did not reveal some details contained in additional affidavits now offered by Tibbetts, including affidavits from his sister and a female friend of Tibbetts at the General Protestant Orphan home, Dr. Weaver did not diminish or downplay the difficulties experienced by Tibbetts during his childhood. Tibbetts argues, however, that the testimony of Dr. Weaver should have been supplemented by testimony from Tibbetts’ family members. But affording trial counsel a “heavy measure of deference,” we cannot conclude that there is no conceivable trial strategy that would present evidence of Tibbetts’ childhood through a mental health expert, as opposed to friends and family members, who might be seen as having an incentive to stretch the truth in order to save Tibbetts’ life.
Furthermore, “in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way — in strength and subject matter — from the evidence actually presented at sentencing.” Hill v. Mitchell, 400 F.3d 308, 319 (6th Cir.2005). The evidence in the affidavits Tibbetts now offers does not meet this test, but is cumulative, albeit somewhat more detailed. The new evidence does not differ in subject matter — ■ much less “in a substantial- way” — from the evidence already presented at sentencing. It covers the exact same subject, namely, the difficult and abusive childhood that Tibbetts suffered. Certainly this new evidence cannot be described as “shocking, disheartening, and utterly disturbing,” the kind of evidence that we have held would generally support a finding of prejudice warranting habeas relief. See Beuke v. Honk, 537 F.3d 618, 646 (6th Cir.2008).
While the dissent effectively reviews the additional, cumulative evidence, it fails to explain how such evidence, had it been *445 presented, would have done anything to change the jury’s perception of Tibbetts’ moral culpability for such a brutal and horrific crime. See Jells v. Mitchell, 538 F.3d 478, 498 (6th Cir.2008) (“Prejudice is established where, taken as a whole, the available mitigating evidence might well have influenced [the sentencer’s] appraisal of [the petitioner’s] moral culpability.”) (internal quotation marks omitted). This case is similar to Phillips v. Bradshaw, 607 F.3d 199 (6th Cir.2010). There, the petitioner, Phillips, had been convicted of the rape and aggravated murder of a three year old girl. The jury recommended a sentence of death for Phillips. At the sentencing phase, Phillips’ counsel focused on Phillips’ good character and good behavior in the community. Id. at 210. A psychologist testified as to Phillips’ low IQ, low tolerance for stressful situations, and need for a structured environment. Id. at 211. The psychologist specifically testified that there was no sign that Phillips had grown up in a physically or sexually abusive environment. Id. In his habeas petition, Phillips claimed ineffective assistance of counsel, pointing to Child Service Bureau reports, the testimony of various half-siblings, and another psychologist’s report that would have detailed an abusive childhood. Id. at 211-15. This court had no problem in deciding that given the brutality of the crime, such additional evidence— even covering substantially different subject matter — was not enough to conclude that the state court was objectively unreasonable in holding that there was no reasonable probability that the outcome of the sentencing would have been different. Id. at 219.
Here, the brutality of Tibbetts’ crimes would have completely overwhelmed any additional, cumulative mitigation evidence of Tibbetts’ difficult childhood. Tibbetts murdered two people — his own wife and a sixty-seven year old disabled man, suffering from emphysema, breathing from an oxygen tank. When the police found James Hicks’ dead body, they found no fewer than three knives that Tibbetts had used still sticking in his body, with another blade broken off in his back. There were no signs that the disabled Hicks put up a fight. Tibbetts own wife, Susan Crawford, was able to fare slightly better, as her broken arm indicates that she may have attempted to fight off Tibbetts for a time. But that attempt failed and she succumbed to the attack, dying in a pool of her own blood, skull cracked, pieces of her brain scattered on the floor. Tibbetts also inflicted multiple knife wounds upon his wife’s body, at least nine of which came after he had already killed her.
But there is no need to substitute our own judgment on the matter. The state court already concluded that such additional evidence would have made no difference in the outcome — one life sentence and one sentence of death. We cannot say that the court was “objectively unreasonable” in doing so. Tibbetts has failed to overcome the presumption that his trial counsel acted in accordance with a sound trial strategy, and he cannot show prejudice from the trial counsel’s failure to present the evidence Tibbetts now offers. Moreover, Tibbetts cannot show that the state court applied these standards in an objectively unreasonable manner. Accordingly, we will affirm the district court’s denial of this claim.
III. Failure to appeal the trial court’s weighing of mitigating evidence
In this third claim, Tibbetts argues that his appellate counsel was ineffective because he did not challenge the state trial judge’s failure to adequately consider all mitigation evidence. According to Tibbetts, the trial court clearly erred in failing to consider all the mitigating factors, and *446 it was unreasonable for appellate counsel to fail to raise on direct appeal the trial court’s error. Applying the heavy measure of deference to counsel’s decisions required by AEDPA, we conclude that this claim fails because it is unclear that the trial court did not consider the mitigating factors. Moreover, even if the trial court erred and counsel was unreasonable in failing to raise the claim, there was no prejudice because the Ohio Supreme Court cured any defect by conducting an independent re-weighing of the mitigating and aggravating factors, and affirmed the sentence of death.
Tibbetts argues that the trial court violated clearly established federal law by failing to comply with the requirement that all mitigation evidence be considered at sentencing. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Davis v. Coyle, 475 F.3d 761 (6th Cir.2007). Tibbetts relies, however, on a slight misstatement of the rule established in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and applied by the Eddings Court. The rule is that the sentencer must be permitted to consider any relevant mitigating factor, Eddings, 455 U.S. at 112, 102 S.Ct. 869, not that the sentencer must expressly list all relevant mitigating factors.[3] In Davis, we applied the rule and remanded because the trial court had excluded mitigating evidence. Davis, 475 F.3d at 774. But the record here is devoid of any indication that the trial court excluded any evidence. In fact, the trial court expressly weighed a number of mitigating factors and stated clearly that it had considered all mitigating evidence.
Plaintiff argues that the trial judge was insufficiently clear in describing all of the mitigation evidence which was considered. In support of this argument, Plaintiff cites to Ohio sentencing law, Ohio Rev.Code § 2929.03(F), which requires that a trial judge state, “in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in [Ohio statute], the existence of any other mitigating factors, ... and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.” However, even Tibbetts acknowledges that the trial court stated that there were two statutorily required mitigation factors present: (1) lack of capacity to appreciate the criminality of his conduct; and (2) “any other factors that call for a penalty of less than death or to lessen the appropriateness of the death penalty.” Ohio Rev.Code § 2929.03(B)(3) & (7). Tibbetts points to the fact that the trial court did not find any “other factors” in mitigation, and argues that this is evidence that the trial court failed to truly consider any “other factors.” This is pure speculation, which fails to meet the clear and convincing standard required to overcome the presumption of correctness afforded state trial courts’ findings of fact. 28 U.S.C. § 2254(e)(1).
Even assuming, arguendo, that the state trial judge’s sentencing opinion failed to meet the requirements of § 2929.03(F), the Ohio Supreme Court’s independent consideration of the mitigating evidence allegedly ignored by the trial judge cured any error. State v. Lott, 51 Ohio St.3d 160, 555 *447 N.E.2d 293, 304 (1990). Tibbetts argues that the Ohio Supreme Court effectively found error in the trial court’s weighing of mitigating factors when it afforded some weight to Tibbetts’ troubled childhood and family background, his drug use, his expressed remorse, and his ability to maintain gainful employment prior to the work-related accident that reintroduced drugs into his life. Tibbetts, 749 N.E.2d at 259. However, even if the Ohio Supreme Court intended to make an implied finding of error, its express reconsideration of those very mitigating factors, and its subsequent decision to affirm the trial court’s imposition of the death sentence cured any error. Because the Ohio Supreme Court raised, sua sponte, and rejected the very claim that Tibbetts argues appellate counsel should have raised on direct appeal, he cannot show prejudice from his appellate counsel’s actions. We affirm the district court’s denial of relief on this claim.
CONCLUSION
Accordingly, and for the reasons set forth above, we AFFIRM the district court’s denial of Petitioner’s habeas petition.

. Not only were the claims in White virtually identical to those presented here, but the expert testimony at issue was to be offered by Drs. Kandiko and Ort, the same experts who testified at the evidentiary hearing before the district court.

. While the dissent is able to cite several cases as examples of performance by counsel that go above and beyond the constitutional minimum, Dissent at 10-11, these cases are not useful for establishing what indeed the constitutional minimum is, and whether or not Tibbetts’ counsel fell below that standard.

. That rule, of course, incorporates a prohibition on a trial court’s express refusal to consider relevant mitigating evidence. However, the rule does not require a trial court to make an extensive list of all possible factors in mitigation, and then address each factor in turn. Such a rule would, of course, be an invitation to mischief, for clever counsel would always be capable of finding one additional factor, however minor, that should have been included on the list.